UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JESSICA EISENBARTH,

     Plaintiff,

   - against -

              Case No: 2:23-cv-1366

              COMPLAINT

LESSING'S INC. d/b/a  LESSING'S    JURY TRIAL DEMANDED
HOSPITALITY GROUP; and JAMES
OLSEN,
        Defendants.
--------------------------------------------------------X

   COMES NOW Jessica Eisenbarth ("Ms. Eisenbarth"), by and through her attorneys, Sacco

& Fillas LLP, at 31-19 Newtown Ave., 7th Floor, Astoria, New York 11102 and as and for her

complaint against defendants, Lessing's Inc. d/b/a Lessing's Hospitality Group ("Lessing's") and

James Olsen ("Olsen," and together with Lessing's, "Defendants" or "defendants"), hereby states

and alleges as follows:

<u>Statement Pursuant to Local Civil Rule 1.9</u>

   1.  Plaintiff is an individual citizen of the United States of America and, as such, has

no interests or subsidiaries that need to be disclosed.

<u>Nature of the Action</u>

   2.  This action arises under, *inter alia*, Title VII of the Civil Rights Act of 1964, as

amended; New York Executive Law §296 *et seq*. (including as updated in 2018 by 2018 Sess.

Laws of New York, Ch. 57 (S.7507-C), Part KK); the Federal Labor Standards Act ("FLSA"); the

New York Labor Law ("NYLL") as well as various additional state and common law causes of

action based on the sexual harassment, retaliation, disparate treatment, hostile work environment,

harassment, and ultimately constructive discharge perpetrated against Ms. Eisenbarth by Lessing's

and various employees thereof, including, but not limited to, Olsen, on the basis of her gender and in retaliation for her complaints of discrimination, harassment, hostile work environment, and abuse.

## Jurisdiction

3.      Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1331, in that these claims arise under the laws of the United States; and over the state law claims pursuant to the doctrine of pendent jurisdiction as codified in 28 U.S.C. § 1367.  This action is timely filed within ninety (90) days of the issuance on November 23, 2022 of a valid Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC"), a copy of which is annexed hereto as Exhibit "A".

## Venue

4.      This action is properly laid in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1), because the Defendants reside in this judicial district, and (b)(2), because a substantial part of the events and omissions giving rise to the claim occurred in this judicial district.

## Parties

5.      Jessica Eisenbarth is an individual citizen of the United States of America with primary residence in the State of New York.

6.      Lessing's is a domestic corporation with its principal place of business located at 3500 Sunrise Highway, Great River, New York 11739.  Lessing's is the owner of the Sand Bar, the establishment at which Eisenbarth was employed.  Upon information and belief, Lessing's through its various establishments employs over 100 individuals.

7.      Upon information and belief, Olsen is an individual citizen of the State of New York, a resident of the State of New York and the General Manager of The Sand Bar, a business

entity owned and operated by Lessing's.  Not only is Olsen an employer by virtue of his ability to effect the terms and conditions of Eisenbarth's employment, but also he is subject to individual liability for his actions as an aider and abettor who actually participated in the conduct giving rise to the claims of discrimination herein.

<u>Limited factual Background</u>

8.      Ms. Eisenbarth started working at Respondent as a bartender in August 2020.

9.      Shortly after commencing work at Sandbar, Ms. Eisenbarth began experiencing sexually harassing behavior and discriminatory practices.  Managers, including Olsen, would routinely call her names like "lambchop" that they did not use when addressing male employees. Olsen routinely addressed female staff with pet names and routinely acted in an unprofessional and an often personally abusive manner.

10.     One male assistant manager and bartender was particularly offensive at times.  In late 2020 while Ms. Eisenbarth was working behind the bar, this male assistant manager came up to her and started commenting on the female patrons and staff in a completely inappropriate manner in describing their looks.

11.     He went on to call them all "hags" and stated that Ms. Eisenbarth was the hottest one there.  He then stated, "I am sexist so what.  I won't tell HR if you won't." This whole circumstance made Ms. Eisenbarth very uncomfortable.

12.     Shortly thereafter, the same assistant manager again came behind the bar while Ms. Eisenbarth was working.  At that time, someone had put a box and/or ice container near the exit and the assistant manage told Ms. Eisenbarth that she could move the box or he would be stuck behind the bar with her.

13.     Ms. Eisenbarth was very busy attending to customer orders so she said that she would move the box but if he was stuck for a few minutes he would just have to wait.

14.     The assistant manager then, completely uninvited, wrapped his arms around her and pulled her against his body and whispered in her ear that he had been waiting for her to say that she wanted him stuck somewhere with her and that they could go down to the office and he will shut the door and that no one has to know.

15.     Again, he also stated that he would not tell HR if she did not.  He then kissed her cheek.

16.     Appalled, Ms. Eisenbarth moved away and called Dan Leopald ("Mr. Leopald" and Kristen Conradi ("Ms. Conradi"), both senior staff members.

17.     Ms. Conradi told Ms. Eisenbarth that the assistant manager had been fired from his previous position for sexual harassment and that the company had hired him despite being aware of that fact.

18.     Upon information and belief customers had also complained about his behavior and comments.

19.     Especially as it was during COVID, and knowing that management was aware of this assistant manager's actions but had taken no steps to discipline him or limit his offensive and disturbing behavior, Eisenbarth hesitated to contact HR for fear of retaliation.  Her fears would shortly be justified.

20.     A few weeks later, the same manager – when they were again scheduled during the same shifts – followed her around all night just staring at her.

21.     This harassment – without any repercussion to the assistant manager or protection for Ms. Eisenbarth – caused her severe stress and anxiety.

22.     Ms. Eisenbarth, her management having done nothing to correct the situation,  then contacted HR and made a formal complaint.   Although an "investigation" was opened, the company continued to have Ms. Eisenbarth work at the same time as the assistance manager about whom she was forced to complain about to HR due to his improper touching, improper solicitations, improper comments, and improper actions.

23.     Thereafter, on or about January, 2021, HR finally directed that Ms. Eisenbarth and the assistant manager not be scheduled for shifts at the same time.

24.     However, when the shifts were changed, it was Ms. Eisenbarth, not the assistant manager, who was penalized, losing a lucrative weekend shift. The retaliation continued to escalate thereafter.

25.     It was at this point that the behavior of the General Manager, Olsen, also began to intensify.  As an initial matter, Olsen falsely told HR that Ms. Eisenbarth had been given a double shift on Saturday on a forward-going basis on January 19, 2021 – a date already several weeks after Olsen had taken her Sunday shifts away from her to accommodate the assistant manager's schedule.

26.     However, that statement was not true.  As of March 5, 2021, Ms. Eisenbarth had still not been given the Saturday double shift that she had been promised and was due. Management simply did not care.

27.     Throughout these two months, and thereafter, Olsen would routinely verbally abuse and chastise Ms. Eisenbarth for no legitimate reason whatsoever.

28.     He would speak to her so improperly that other employees would have to intervene.

29.     In addition to the verbal abuse and humiliation, Olsen would routinely – and without any legitimate basis – claim that the accounts were not balanced at the end and verbally assault her for such alleged, but patently and knowingly false, errors.

30.     In an additional attempt to work within the system and earn a decent living, Ms. Eisenbarth also asked for the opportunity to serve on shifts when she was not bartending.

31.     Other bartenders that had not complained of sexual harassment were afforded that option, even while Ms. Eisenbarth was repeatedly denied.  Even more telling is the fact that during the summer of 2020, Ms. Eisenbarth had been given the option of serving other shifts when she was not bartending, but after she had complained of sexual harassment that opportunity was then denied to her.  The blatant retaliation that she had feared was being effectuated in an abjectly shameless fashion. Again, HR was informed but chose to take no corrective action.

32.     By April, as the sole bartender with no double shifts – and the sole bartender who had made a formal complaint of sexual harassment – and still never having received the Saturday double shifts as promised by both HR and Olsen, Ms. Eisenbarth was forced to take on a second job.

33.     Olsen's harassment and retaliation extended to singling out friends of Ms. Eisenbarth who visited the restaurant as patrons.  This harassment often held improper racial overtones.  When Ms. Eisenbarth's then boyfriend, who was Spanish, visited The Sand Bar, Olsen initially relegated him to a back room and refused to seat him in the main dining area or at the bar. On several occasions Olsen would challenge this gentleman asking how he could afford the food and drinks that he was ordering.  This same line of inquiry also was raised by Olsen when his inappropriately inveigled himself into a conversation between friends of Ms. Eisenbarth's concerning the property where her then boyfriend resided.  The clear implication of all these acts

was that an individual of Spanish origin did not belong at the Sand Bar and could not afford to legitimately live in such an area.

34.     Olsen also sought to improperly preclude Ms. Eisenbarth from coming to the restaurant as a patron when she was not working.  While Ms. Eisenbarth was trying to build up business for the restaurant and herself, Olsen harassed her guests, including asking one woman one numerous occasions how she knew Ms. Eisenbarth and why was she with Ms. Eisenbarth.

35.     Ms. Eisenbarth was also routinely denied the standard employee discount that was afforded to all other employees.  No other employee was so singled out or harassed when they came to the restaurant during their time off.

36.     Again, the only distinguishing factor between Ms. Eisenbarth and the other employees who were given the standard employee discount, was the fact that Ms. Eisenbarth had filed a formal complaint of sexual harassment.

37.     Ms. Eisenbarth again raised these issues with HR, but the behaviors again continued unabated.

38.     During the week of April 18, 2021, Olsen again improperly took tip money from Ms. Eisenbarth and never returned the same.

39.     On April 25, 2021, Olsen again lost control.  He repeatedly screamed and cursed at Ms. Eisenbarth.  After having been drinking most of the evening, Olsen claimed that the "bank" was short $151 dollars. As he was cursing in public, Ms. Eisenbarth and the other bartender tried to calm him down.  In response Olsen repeatedly yelled at them to "Shut up" and kept cursing.

40.     When he improperly and illegally demanded that Ms. Eisenbarth pay to correct the bank and was properly refused, he promptly told Ms. Eisenbarth that she could not work there anymore and continued his screaming.  When he was asked to calm down, he again yelled at Ms.

Eisenbarth to "Shut up," before storming off.  This uncontrolled tirade was witnessed by various individuals.

42.     Ms. Eisenbarth duly made management aware of these ongoing abuses and clearly hostile work environment through written correspondence that same day.  Again, no corrective action was taken.

42.     In that same correspondence, Ms. Eisenbarth also reiterated examples of clear disparate treatment, including, but not limited to, male employees (who had not filed complaints of sexual harassment) being allowed to drink and eat at the restaurant when not working a shift, while Ms. Eisenbarth was not so permitted; Ms. Eisenbarth being denied her employee discount while male employees who had not complained of sexual harassment were given their employee discounts; Ms. Eisenbarth being denied compensation for days that the restaurant closed for COVID but only after she had come to work while other employees who had not complained of sexual harassment were paid; Ms. Eisenbarth being denied compensation for the time incurred going to be tested for COVID as mandated by Mr. Olsen.

43.     Two days later, on April 27, 2021, Ms. Eisenbarth reached out again to notify HR that Olsen, presumably then sober, had re-run the numbers from two nights prior and recognized, as Ms. Eisenbarth had repeatedly said, that there was not, in fact, any $151 missing and that the books properly reconciled.

44.     Olsen routinely apologized to other staff who had not complained of sexual harassment, retaliation, and discrimination, but again continued to single out Ms. Eisenbarth for disparate and retaliatory treatment going so far as to tell other managers to never apologize to her.

45.     On May 6, 2021, Olsen directed Ms. Eisenbarth to work behind the bar with the same employee that had previously sexually harassed her.

46.     When Ms. Eisenbarth properly refused, Olsen told her that she did not have a choice.  Olsen knew that Ms. Eisenbarth did not have to and should never have to work with an individual – especially in the close quarters behind a bar – who had sexually harassed her.

47.     He intentionally, purposefully, and maliciously caused Ms. Eisenbarth anxiety and fear.  He wanted to retaliate against and abuse Ms. Eisenbarth. When Ms. Eisenbarth held her ground, Olsen continued to insist until he finally storming off.

48.     The other employee remained behind the bar for another hour with Olsen's tacit permission, which precluded Ms. Eisenbarth from being able to do her job or earn any tips during that period of time.  When reminded by HR that Ms. Eisenbarth should not be required to work with an employee who had previously sexually harassed her, Olsen apparently said "Fine" and nothing more.  No other action was taken by HR to remediate the situation in any way.

49.     Thereafter, Olsen removed Ms. Eisenbarth from her single Saturday shift.  This after directing a second bartender to "help" her all in an effort to ensure that she made significantly less money and would eventually be forced to leave Lessing's employ.  Even while Ms. Eisenbarth was forced to work with a second bartender, a male bartender who had not complained of sexual harassment and retaliation and who was genuinely in need of assistance, did not have his compensation cut with the addition of a second bartender during his shifts.

50.     On May 22, 2021, Ms. Eisenbarth related additional instances of retaliation, harassment, intimidation, and discrimination to HR.  Specifically, she related how Olsen once again publicly chastised and harassed her in a verbally abusive manner for a negative review on Open Table asserting it was against her despite the fact that she had not even worked the day that the review was focused on.

51.     Management also threatened to write her up for attending to a family medical emergency despite her – as per company policy, procedure, and permitted past practice – having directly contacted management reasonably in advance of the required leave and having obtained coverage for the shift in question.

52.     On May 26, 2021, Ms. Eisenbarth had another zoom meeting with HR to discuss the ongoing abuses.

53.     Despite having such a meeting, the behaviors continued.

54.     Having been ignored by HR yet again and having received no relief from the abuse, Ms. Eisenbarth began suffering panic attacks which forced her to seek additional medical care.

55.     As a result of the actions of Respondent and its management team, Ms. Eisenbarth's doctor directed that she take a few days off from work, June 3-5, 2021.  HR was made aware of this circumstance, but again took no corrective action.

56.     Shortly thereafter, Ms. Eisenbarth was also diagnosis with Lupus.  Olsen was made aware of both the diagnosis and the panic attacks.  Despite this knowledge, his behavior did not improve.

57.     On July 22, 2021, Ms. Eisenbarth arrived at work and almost immediately was asked by a co-worker if he could speak to her.  Apparently, Olsen had lied to the co-worker and attributed statements to Ms. Eisenbarth about the co-worker that were simply not true.

58.     Olsen was no longer satisfied with directly harassing Ms. Eisenbarth anymore, he now felt the need to try to turn her co-workers against her.  Ms. Eisenbarth was forced to seek additional treatment and was directed to take an additional day off work by her physician as a result of this latest scheme to coerce Ms. Eisenbarth to leave Respondent.

59.     Ms. Eisenbarth again complained to HR in writing on July 26, 2021.  HR responded on July 27, 2021, chastising her for taking time off without more notice (purposefully ignoring the reality that it was the ongoing retaliatory abuse and harassment by Olsen left unchecked by HR despite specific knowledge of the same which necessitated the leave in the first place); removed her from the schedule for the week, punishing her for taking leave necessitated by the harassment of the general manager; inaccurately denied statements made by Olsen; and asserted that no other action would be taken against Olsen to prevent the ongoing abuse.  HR's response again only served to exacerbate the intolerable conditions at the restaurant.

60.     On July 31, 2021, Ms. Eisenbarth responded in writing to correct the false record being created by HR.

61.     On August 3, 2021, HR responded and sought to have Ms. Eisenbarth miss another shift and relevant pay to discuss her complaints at the Corporate Office at a time convenient only for them.  While HR did ultimately meet with Ms. Eisenbarth, the representative pretended not to have known the scope of her complaints, despite having been repeatedly informed of the same in a series of written complaints over the prior eight months.

62.     Nevertheless, there was no improvement at the restaurant.

63.     Management continued to preclude the most supportive female servers from working with Ms. Eisenbarth.

64.     In addition, management denied a request for a day off on August 28, 2021 in direct violation of company policy and practice.  Ms. Eisenbarth had made the request more than three weeks in advance and had obtained coverage for her shift on that day, but the request was still denied in another clear act of retaliation and abuse.

65.     Ultimately, on August 26, 2021, Ms. Eisenbarth, no longer able to take the unchecked and clearly condoned abuse, harassment, disparate treatment, and blatant retaliation, was constructively discharged.

66.     In direct contravention of applicable law, Defendants developed no policy for the prevention of sexual harassment, much less provided a copy of the same to employees or even any raining with regard to the same.

67.     Had Defendants complied with the applicable laws in the State of New York, she would not have suffered so dramatically.

68.     As a direct result of these discriminatory and retaliatory acts on the part of Defendants, Ms. Eisenbarth has suffered, and continues to suffer, injury, mental anguish, and harm.

69.     On or about June 21, 2022, Ms. Eisenbarth filed a Charge of Discrimination with the EEOC.  Lessing's never responded to that Charge or the EEOC.

70.     As a result and after request by Ms. Eisenbarth, the EEOC duly issued a Right to Sue Letter dated November 23, 2022.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
(Discrimination On The Basis Of Sex / Gender Under Title VII and Against Lessing's)

71.     Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "70" above with the same force and effect as if fully set forth herein at length so that each instance of discrimination and disparate treatment set forth in this complaint is incorporated by referenced herein even if not retyped.

72.     Title VII prohibits discrimination, including disparate treatment, on the basis of gender / sex.

73.     Defendants consistently and repeatedly treated Ms. Eisenbarth disparately and worse than all of her male colleagues.

74.     Ms. Eisenbarth was sexually harassed at work and thereafter forced to work with her harasser.

75.     When she complained, it was her hours and earning capacity that was diminished, not that of her harasser.

76.     Members of management themselves used derogatory terms when addressing female employees, including, but not limited to, Ms. Eisenbarth, while similarly situated male bartenders were always addressed by their proper names.

77.     Management also yelled – and permitted managers to yell – at and be verbally abusive to female employees while not allowing – or effecting – such behavior against the similarly situated male bartenders.

78.     In addition, management actively tried to discourage her from eating and drinking at her work establishment while no similarly situated male employees were allowed to do so without ever being questioned.

79.     Ms. Eisenbarth was denied an employee discount for food when she was allowed onto the premises while not on a shift – a discount afforded to all similarly situated male employees.

80.     Defendants improperly also sought to take tips and other earnings from Ms. Eisenbarth that they did not take from any similarly situated male employees.

81.     Defendants also precluded Ms. Eisenbarth from picking up non-bartending shifts during unassigned times, while allowing similarly situated male employees who desired such shifts to pick-up such shifts.

82.    Ultimately, the disparate treatment was perpetrated, condoned, and exacerbated by Defendants to such an extent that a reasonable person in Ms. Eisenbarth's position would be forced to remove herself from the hostile environment.

83.    Under these circumstances the conditions deteriorated to such an extent that Ms. Eisenbarth was forced to seek medical attention.

84.    As a result, Ms. Eisenbarth could no longer reasonably be expected, nor would a normal person be reasonably expected, to continue employment under such conditions, and, as such, was constructively discharged.

85.    As a direct result of this discriminatory disparate treatment, Ms. Eisenbarth has been damaged in an amount to be determined at trial, but believed to be not less than $170,000.00, the costs and disbursements of this action, including reasonable attorneys' fees; punitive damages due to the clear malice and reckless indifference demonstrated by Lessing's; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>
(Retaliation Under Title VII and Against Lessing's)

86.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "85" above with the same force and effect as if fully set forth herein at length so that each instance of retaliation set forth in this complaint is incorporated by referenced herein even if not retyped herein.

87.    Title VII prohibits retaliation for making complaints of discrimination.

88.    As set forth above, Ms. Eisenbarth made various complaints of discrimination to Defendants and about which all Defendants were aware.

89.    Also as noted above, the disparate, treatment, harassment, and abuse were all exacerbated after each complaint of discrimination.

90.     The retaliatory acts each followed directly upon the heels of the complaints made by Ms. Eisenbarth.

91.     In one of the most clear-cut retaliatory acts, prior to complaining of discrimination and sexual harassment, Ms. Eisenbarth was allowed to take on non-bartending shifts when not bartending; but after complaining, Ms. Eisenbarth was no allowed to take on such additional shifts.

92.     In addition, after complaining of discrimination and sexual harassment, Ms. Eisenbarth had her hours repeatedly cut; had her shifts cut; had her opportunities for pay cut; was deprived of lucrative shifts while her accused harasser maintained those lucrative shifts.

93.     As a direct result of her complaints of discrimination, Ms. Eisenbarth thus suffered numerous adverse employment actions.

94.     Ultimately as a direct result of these retaliatory acts, Ms. Eisenbarth was forced to seek medical attention.

95.     When Ms. Eisenbarth sought such medical help, she was also diagnosed with lupus.

96.     As a result of her seeking such help as necessitated by the Defendants' ongoing harassment and retaliation, Defendants further retaliated against her: chastising her for taking time to see a doctor; taking her off shifts yet again, and denying her time off that was routinely and universally granted under like conditions to other similarly situated employees who had not complained of discrimination and retaliation.

97.     As a result, Ms. Eisenbarth could no longer reasonably be expected, nor would a normal person be reasonably expected, to continue employment under such conditions, and, as such, was constructively discharged.

98.     As a direct result of this retaliatory treatment, Ms. Eisenbarth has been damaged in an amount to be determined at trial, but believed to be not less than $170,000.00, the costs and

disbursements of this action, including reasonable attorneys' fees; punitive damages due to the clear malice and reckless indifference demonstrated by Lessing's; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A THIRD CAUSE OF ACTION<br>(Hostile Work Environment Under Title VII and Against Lessing's)

99.     Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "98" above with the same force and effect as if fully set forth herein at length so that each instance of harassment set forth in this complaint is incorporated by referenced herein even if not retyped herein.

100.     Title VII prohibits the creation of a hostile work environment.

101.     As set forth and detailed above, Ms. Eisenbarth was clearly harassed and suffered ongoing and repeated harassment due to her gender / sex.

102.     Defendants created, fostered and left unchecked an abusive environment which guaranteed a hostile work environment, disparate treatment, and general discriminatory employment actions as against Ms. Eisenbarth based on her gender / sex.

103.     Ms. Eisenbarth, as set forth above, was specifically mistreated, harassed, subjected to verbal abuse, subjected to repeated employment sanctions, subjected to loss of pay, subjected to loss of employment opportunities benefits, and subjected to a clear hostile work based upon her gender / sex.

104.     The environment, fostered, cultivated, and permitted by Defendants was suffused with such ongoing harassment, ridicule, intimidation, and insult that it altered the conditions of Ms. Eisenbarth's employment.

105.     She did not feel safe or protected at work, nor would a normal person under the conditions under which Ms. Eisenbarth was forced to work.

107.    The hostility was so intense that other employees sought to intervene and ultimately

result in Ms. Eisenbarth having to seek medical attention and take medically advised time away

from work.

108.    When the hostility and abuse continued thereafter, it was clear that Defendants sole

goal – to get rid of Ms. Eisenbarth – was going to be effected through their constructive discharge

of Ms. Eisenbarth.

109.    As a direct result of the creation of a hostile working environment, Ms. Eisenbarth

has been damaged in an amount to be determined at trial, but believed to be not less than

$170,000.00, the costs and disbursements of this action, including reasonable attorneys' fees;

punitive damages due to the clear malice and reckless indifference demonstrated by Lessing's; all

relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
(Discrimination On The Basis Of Sex / Gender Under New York Executive Law §296
Against All Defendants )

110.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in

paragraph "1" to "109" above with the same force and effect as if fully set forth herein at length

so that each instance of discrimination or disparate treatment set forth in this complaint is

incorporated by referenced herein even if not retyped herein.

111.    The New York State Human Rights Law ("NYSHRL" also found in New York

Executive Law §296) prohibits discrimination on the basis of sex / gender.

112.    As set forth above, Ms. Eisenbarth, as a female, was clearly and repeatedly treated

differently and worse than similarly situated male employees.  In sum, she was subjected to inferior

terms and conditions of employment compared to her male peers.

113.    In addition, Ms. Eisenbarth was also subjected to direct sexual harassment, including, but not limited to name-calling, inappropriate touching, verbal abuse, and other harassment.

114.    Further, Ms. Eisenbarth was treated to disparate and worse treatment as a female customer of The Sand Bar by Defendants who did not subject male patrons to harassment or subject their guests to abusive and intrusive questioning.

115.    As a result of this discrimination, Ms. Eisenbarth has been damaged in an amount to be determined at trial, but believed to be not less than $170,000.00, the costs and disbursements of this action, including reasonable attorneys' fees; punitive damages due to the clear malice and reckless indifference demonstrated by Lessing's; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A FIFTH CAUSE OF ACTION
(Retaliation Under New York Executive Law §296
Against All Defendants )

116.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "115" above with the same force and effect as if fully set forth herein at length so that each instance of retaliation set forth in this complaint is incorporated by referenced herein even if not retyped herein.

117.    The New York Executive Law prohibits workplace discrimination, adverse employment decisions and disparate treatment in retaliation for the submission of complaints alleging discrimination.

118.    As set forth above, Ms. Eisenbarth duly complained of sexual harassment to Defendants and suffered harm as a direct result thereof.

119.    Thereafter, as the abuse continued, Ms. Eisenbarth complained of improper retaliation and additional disparate treatment and discrimination to Defendants, all of whom were aware of such complaints.

120.    Ms. Eisenbarth suffered additional harm as a direct and clearly proximate result of those additional complaints to Defendants.

121.    As a result of this improper retaliation, Ms. Eisenbarth has been damaged in an amount to be determined at trial, but believed to be not less than $170,000.00, the costs and disbursements of this action, including reasonable attorneys' fees; punitive damages due to the clear malice and reckless indifference demonstrated by Lessing's; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A SIXTH CAUSE OF ACTION</u>
(Hostile Work Environment Under New York Executive Law §296
Against All Defendants )

122.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "121" above with the same force and effect as if fully set forth herein at length so that each instance of harassment set forth in this complaint is incorporated by referenced herein even if not retyped herein.

123.    As set forth above, Ms. Eisenbarth was clearly treated less well than other similarly situated male employees based solely on her gender / sex.

124.    Ms. Eisenbarth, as set forth above, was specifically mistreated, harassed, subjected to verbal abuse, subjected to repeated employment sanctions, subjected to loss of pay, subjected to loss of employment opportunities benefits, and subjected to a clear hostile work based upon her gender / sex.

125.     The environment, fostered, cultivated, and permitted by Defendants was suffused with such ongoing harassment, ridicule, intimidation, and insult that it altered the conditions of Ms. Eisenbarth's employment.

126.     She did not feel safe or protected at work, nor would a normal person under the conditions under which Ms. Eisenbarth was forced to work.

127.     The hostility was so intense that other employees sought to intervene and ultimately result in Ms. Eisenbarth having to seek medical attention and take medically advised time away from work.

128.     When the hostility and abuse continued thereafter, it was clear that Defendants sole goal – to get rid of Ms. Eisenbarth – was going to be effected through their constructive discharge of Ms. Eisenbarth.

129.     As a direct result of the creation of a hostile working environment, Ms. Eisenbarth has been damaged in an amount to be determined at trial, but believed to be not less than $170,000.00, the costs and disbursements of this action, including reasonable attorneys' fees; punitive damages due to the clear malice and reckless indifference demonstrated by Lessing's; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A SEVENTH CAUSE OF ACTION
(Additional Violations Under NHYSHRL)

130.     Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "129" above with the same force and effect as if fully set forth herein at length so that each instance of harassment set forth in this complaint is incorporated by referenced herein even if not retyped herein.

131.     The NYSHRL requires that businesses like Lessing's create, and provide to each employee, a written sexual harassment prevention policy.

132.    Lessing's abjectly failed to fulfill this obligation -- especially as to management and employees who worked at The Sand Bar and the related human resource personnel assigned to that establishment.

133.    The NYSHRL requires that businesses like Lessing's provide sexual harassment prevention training.

134.    Lessing's abjectly failed to fulfill this obligation – especially as to management and employees who worked at The Sand Bar and the related human resource personnel assigned to that establishment.

135.    As a direct result of these violations, Ms. Eisenbarth has been damaged in an amount to be determined at trial, the costs and disbursements of this action, including reasonable attorneys' fees; punitive damages due to the clear malice and reckless indifference demonstrated by Lessing's; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>Jury Demand</u>

136.    Plaintiff hereby demands a trial by jury.

Dated: February 21, 2023                    Signed,
       Astoria, New York

                                   By: _____*/s/Clifford Tucker*_____
                                     Clifford Tucker, Esq.
                                     Sacco & Fillas LLP
                                     31-19 Newtown Ave., 7th Floor
                                     Astoria, New York 11102
                                     Ph: 718-269-2243
                                     CTucker@SaccoFillas.com